The opinion of the court was delivered by
Watkins, J.’
When this succession and the various contestants were last before this court — 40th of Annuals, page 484 — quite a number of questions were adjudicated and others left open for future determination, and for that purpose the cause was remanded to the lower court.
They are (1) for the ascertainment of the amount for which the shares or interests of the two major heirs of Mrs. Sparrow are liable to John Chaffe & Sons, growing out of their written agreements, touching the cultivation of the succession plantations by Edward Sparrow and Chris. Chaffe, Chaffe administrators, and the advances made and supplies furnished by said firm for the purpose of said cultivation; and (2) for the adjustment of any indebtedness of all the heirs of Mrs. Sparrow for advances made to them by the succession, or by Chris. Chaffe, administrator.
When the case went down to the court below the administrator fiíed his fourth provisional account and three tableaux of debts: one of debts.fiue by the succession; one of debts due by the heirs to the administrator of the succession; one of debts due to John Chaffe & Sons by Edward Sparrow, for which the two major heirs are responsible to the extent of their virile shares in their mother’s succession.
This last indebtedness was the subject of special mention and reservation in each of our opinions and decrees in this succession, in 39th and 40th of Annuals. In those cases all questions appertaining *502 to it were definitely settled, except that of its amount; and the object of this appeal is, mainly, for that purpose.
The major heirs oppose the account and the first and last tableaux, and the tutor of the minors opposes the second tableaux and the account on various grounds.
On the trial, the judge a quo approved and homologated the account and second tableau, without any alteration, rejected the first one in its entirety, and amended the third, so as to fix the total amount due John Ohaffe & Sons at the sum of $31,454.54, capital and interest, on the date judgment was rendered, January 9, 1890; the total amount of the proceeds of the crop of 1883, and the proceeds of the sale of Midland store — less the amount to be reserved from the latter, with which to pay its creditors, G. D. Tutt & Oo. and Orr &Lindsley — at the sum of $20,835.85; and, after the latter had been deducted, the total amount of the net balance due that firm at the sum of $10,618.69. The judgment fixed the amount of the one-third due by Mrs. Kate Forster at the sum of $3539.56, and that due by Mrs. Fannie Ashbridge at the same amount, and ordered the administrator to pay said sums, respectively, with legal interest thereon from date of decree, to the intervenors, as the heirs of John Ohaffe, and the successors in title of John Ohaffe & Sons, out of their respective shares or interests in the succession. It further ordered the administrator to pay to said intervenors the said proceeds of the crop of 1883, on account of their claim against Edward Sparrow, as administrator of succession plantations.
From this judgment all parties have appealed.
In briefs, various points are argued; some of which have already been decided in our previous opinions, and others appertain to claimed items of increase, or diminution of the aforesaid judgment.
I.
Taken in the order stated, the first question presented for consideration is whether the administrator should charge himself with $4000 as the rental value of the succession plantations for the year 1888, or is $3500, as charged in the account, the full amount for which he is liable. The opponents objected to the introduction of any evidence on the question of the rental value of the plantations in 1888, on the ground that our opinion in 39 Annual is res judicata.
The judge a quo overruled them objection and admitted evidence, *503 and opponents reserved a bill of exceptions to his ruling. We think the judge was right in so ruling. Our decree in 1887 could not include a question of rents in 1888. It did not, either in terms or effect, attempt to do so. We simply held “that, having made no effort to lease the plantations under his administration, he is liable for the rental value of the same during the time he cultivated them for his own account, under the law.” Oonsidering the evidence, we fixed the rent of the three plantations “at $4000 per annum, subject to deduction for taxes levied thereon.” A the same time we, most distinctly, recognized the right of an administrator to lease succession property, and by private agreement, after due notice. (Pp. 703-704.) Oiting succession of Richmond, 35 An, 858; succession of Myrick, 38 An. 611.
In this ease the evidence shows that an effort was made to obtain a higher price for them, but that, after obtaining an order of Court to that effect, and making public advertisement, $3500 was all he could obtain for the rent of the three plantations, mules, etc., appertaining thereto, and this sum he has collected and charged himself with on his account. This is certainly all he is responsible for, and the'court below correctly entertained that view and homologated the account.
II.
On the first tableau of debts there appear but three items. No complaint is made by any one of the disallowance of the item of $964 in favor of Stevenson and May, and opponent’s objection to which was, that same had been previously allowed on a former account.
(a) Of the second item — it being an amount $1609.45, claimed as being 21-2 per cent, commissions on $64,378.55, as the net value of the succession — the administrator says, that he does not demand the payment now, but merely desires that the amount be liquidated and determined, at this time, in order to prevent future litigation and additional expense; on the other hand, the opponents’ contention is, that this is matter for determination on final account. In the view of the opponents we concur. On the trial of annual or provisional accounts, the questions are: (1) What revenues or other moneys has the administrator received; and (2) what sums has he disbursed. On the trial of a final account, the questions are: (1) What property, and values of all kinds, passed under administration; and (2) has the administrator faithfully administered the succes *504 sion, accounted for all he received, and is he entitled to a discharge. At this time the court mil not examine and decide what amount of compensation he is entitled to receive.
This identical question was argued and decided when the case was last before us, and we said: “The administration is not yet closed, and we do not think that the succession should now be taxed with the entire commissions. These are only properly exigible upon a final settlement, to be adjusted in the final account.” 40 An., p. 492.
We can discover no useful purpose that would be subserved by taking up and deciding the question of the administrator’s right to commissions, confessedly before they are exigible. Non constat that, when they have become exigible, any opposition will be made to their allowance; or that something might not occur, between the judgment and final account, which would render their payment impossible.
Altogether, we think it advisable that the whole matter should be postponed to the final account.
(6) Of the third item — it being an amount of $250, claimed by J. E. Ransdell, attorney for the administrator, as due for professional “services rendered since the death of J. W. Montgomery, in June, 1888,” — the contention of the administrator is that his services have been valuable to the succession; and, that of opponents, that they are covered by, and embraced in, the amounts awarded' in favor of the pre-existing law partnership of Montgomery and Ransdell, of which the claimant was a member, in our last opinion. 40 An. 491, 495. After stating the amount claimed to be $5017.05, less the amount paid, of $900, leaving the balance of $4170.05, we said:
“The fee of Montgomery & Ransdell was reduced to $2862, and, adding the $900 already paid, made $3762.85. * * * We have carefully examined the report and considered the proceedings with special reference to making a just estimate of the services rendered by these gentlemen, and we think they should be allowed a fee of $3250; and, deducting the $900 received by them, would leave a balance due them of $2350; this to include services rendered and to be rendered in the settlement of the succession,” etc.
This is plain enough, and entirely free of ambiguity; but counsel, in brief, cites us to the phraseology employed in our decree, and in *505 vokes it as being decisive of the question in his favor. It is as follows:
“That the fee of Montgomery & Ransdell be fixed at $3250, subject to a credit of $900, already paid, leaving a balance of $2350 due.” Hence, he insists that the opinion- — -or, rather the decree — did not fix the amount of fees of counsel for future services, and his claim is well founded. But we do not regard the word “due” as exercising control over the opinion and the remainder of the decree, as both the opinion and first part of decree fix the sum alike, viz: $3250 less $900, leaving a balance of $2350. We can see no inconsistency between the statement in the opinion that this sum is “to include services rendered and to be rendered in the settlement of the succession,” and that in the decree “of $2350 due.” It may be questionable, or even illegal, if you will, for the full amount of attorney’s fees to be awarded before his services have been fully rendered and the succession wound up; yet, if neither the administrators, heirs or other creditors complain of such an allowance having been made, that is the end of the controversy. But, however that may be, we are not disposed to regard with favor an argument of that kind in behalf of an additional allowance.
Having thus disposed of all the items which figure on the first tableau of debts, we find the judgment of the judge a quo, rejecting all, to be correct, and approve of his decree, in that particular.
III.
On the second tableau of debts there appear only three debts-enumerated, as being due by the heirs of Mrs. Sparrow to Chaffe, administrator, viz:
Amount advanced to Kate Foster, - $4,487 25
Amount advanced to Fannie Ashbridge, - 2,105 00
Amount advanced to minors Decker,- - - - 4,018 84
The vouchers corresponding therewith disclose that these sums are made up of cash, and drafts, of the different parties, on the administrator, which were paid by him, during the year 1883 (latter-part) , 1884, 1885 and 1886, and since. Neither of the' major heirs opposed the amounts charged to them respectively, and hence the only question is, with regard to the charges against the two minors, Mary and Kate Decker.
Their tutor insists that it is not competent for the settlement to *506 be made in the sueeession of their grandmother, on an administrator’s account, but that it should be referred to him as tutor for allowance or rejection, and settlement thereof, in the tutorship. He further contends that, as no debt can be made against minors in excess of .their revenues without the authority of a family meeting (R. O. O. 350), there is no legal reason for the inforcement of the administrator’s demand against them.
In our opinion in 39 Annual, at page 706 we expressed our views, in regard to a part of this claim, thus:
It appears from the record that, since his appointment, the present administrator has * * furnished the means necessary for the maintenance and for the' schooling of the minors Mary and Kate Decker, and that, as they were without a tutor from August, 1883, to the latter part of 1885, the funds were intrusted to Mrs. Foster, who had kindly taken charge of the two minors. All these proceedings were irregular, and were carried on outside of the law, but they were manifestly prompted by laudable feelings, and considerations of fairness, and of humanity, for which the administrator should not be made to suffer, if by any legal means he can obtain reimbursement. * * * *
We therefore deem it our duty to reserve * * * * the rights of the administrator to demand reimbursement of all sums advanced by him to the two heirs aforesaid, as well as for similar advances made to the minors Mary and Kate Decker.”
An examination of the record discloses that all items prior to the 14th of July, 1887, were charged to Mrs. Kate Foster, and those subsequent to that date to C. S. Wyley, tutor.
His opposition denies the correctness of only those items which are charged to Mrs. Foster, and which aggregate §2188.84; but it admits the receipt of the remainder of §1830, and the liability of his wards therefor.
Hence, it is clear that the whole question is remitted to this succession settlement, and that it is narrowed to the amount of money the administrator expended for their account.
We can perceive no objection to this mode of proceeding, as the account ar d two of the tableaux concern the minors, and their interests are still united with those of the major heirs in the succession. And it is quite as much a matter, of justice to the administrator that their liability to him, for advance payments made on their in *507 heritance should be adjusted in the succession as payments so made to the major heirs.
The proof fully satisfies us that Chaffe, administrator, made the advances stated in the tableau, and that the shares or interests of the minors are liable therefor — there being no proof in the record to show that the sum expended exceeded their revenues.
IY.
Before we undertake the discussion of the account of John Chaffe & Sons against Edward Sparrow, as administrator of the plantations of Mrs. Minerva Sparrow’s succession, a brief review of its status, as it appears in our decisions, will be necessary.
During General Sparrow’s administration of his wife’s succession, between the date of her death, in' December, 1879, and the date of his, in July, 1883, he conducted with that firm all of his financial transactions. On account of those dealings, that firm" preferred .against her succession a large claim, the correctness of which had been acknowledged by Sparrow, just before his death. In July, 1883, Christopher Chaffe became administrator, and continued the administration and the affairs of the plantations just as they had been managed by his predecessor. In 1885 he filed an account and tableau of debts, on which the claim of his firm figured, at the debit of of the succession, for the sum of $27,466.68, as due at the date of General Sparrow’s death. They were opposed, and, on appeal, we held that the administrator must be considered and treated as having operated the plantations of the succession for his individual account, with the authorization of the major heirs, and, as such, responsible for the revenues thereof, and chargeable therewith. We also held that John Chaffe & Sons were not the creditors of Mrs. Sparrow’s successson, but of General Sparrow, as the administrator of the succession plantations, and that Mrs. Poster and Mrs. Ashbridge, major heirs, were bound, under their written agreements, each for one-third of that debt, to the extent of their respective virile shares in their mother’s succession. On account of the mixed character of these transactions and the peculiar relations of the parties, it was thought proper that the account of John Chaffe & Sons should be liquidated, and settled in the succession and contradictorily with Chaffe, administrator; therefore, it was ordered by the court, that the administrator shquld apply the net proceeds of the 1883 crop *508 (which was, at that time, standing at the credit of the succession) to> the credit of John Ohaffe & Sons.
But, upon an examination of their accounts, it was ascertained to> be a fact that, in February, 1880, there was at the credit of Mrs. Minerva Sparrow with them the sum of $11,451.61, and that they held her mortgage notes for $11,051.32; and that, instead of applying that sum to the extinguishment of said notes, they incorrectly imputed it to her credit on their account.- We held this to be illegal, and imputed that balance to the discharge of Mrs. Sparrow’s notes, and gave her succession credit for the resulting balance of $400.29. This resulted, of course, in a. corresponding increase of John Qhaffe & Son’s account by that amount.
When the cause went down to the lower court for a trial of the-questions remaining in suspense^ and in pursuance of our express direction, the administrator filed an additional account, and two tableaux of debts, on which the account of John Ohaffe & Sons was restated and the amount fixed at $42,000, and one-half charged to each of the major heirs.
These were approved, and on the trial it was held by the District-Judge that no proof was admissible in reference to this account, and we decided that his ruling was erroneous, and again remanded the case, for the purposes stated above, and directed the judge to admit the rejected testimony. On the return of the case to the lower-court, the issues and pleadings were reformed and disposed as stated in the beginning of this opinion.
(a) As stated in transcript and brief of John Ohaffe & Sons, this-account stands thus, viz :
Balance due July 5, 1883 - $27,466 68
To amount paid on mortgage - 11,451 61
To interest on last to July 5, 1883 - 3,081 75
Aggregating - - - - . - - $42,000 04
Opponents not only deny and vigorously resist this additional charge of $11,451.61, with interest, but also the whole claim of John Ohaffe & Sons.
On the trial their counsel admitted that in the account there was erroneously charged, as a debit, the sum of $2,974.51, and that that sum was a debt of A. M. Ashbridge, the husband of one of the major heirs and opponents, and should be deducted. Said sum, with *509 interest to July 5, 1883, aggregated $3,733.52, and when credited on the account there was left a balance due of $38,266.52.
Originally there was, also, a personal debt of Gen. Sparrow charged up in their account, but the proof shows that, upon holding a conference with him upon the subject, same was credited back again and completely eliminated therefrom.
From what is recited in the preceding part of this paragraph on the subject, it is manifest that the sum of $11,451.61, with interest, was correctly charged into the account again, and properly figures as an additional debit against General Sparrow, because John Ohaffe & Sons had improperly given him credit for just that amount of Mrs. Sparrow’s personal funds, which were in their hands before her husband was appointed administrator of her succession.
Having thus withdrawn that amount of credit, there must, necessarily, be a corresponding amount of debit against General Sparrow. We think the account has been correctly restated at the figures above given. The proof fully satisfies us of the correctness of the demand. All of the accounts are before us in the original, and to them are appended the original depositions of the then members of the firm, which were taken in 1886, and have, since that date, been on file in the mortuoria, and have been previously submitted to this court for examination. Those witnesses were submitted to a rigorous cross-examination by the opponent’s present counsel, who have failed to produce any countervailing evidence. They each testify to the correctness of each and every item of the accounts, and upon their uncontradicted evidence we feel warranted in approving and allowing them for the balance claimed of $38,266.52, with legal interest from July 5, 1883.
(6) Counsel for opponents, however, insist that the account of John Chaffe & Sons is not for strict plantation supplies, a large part of the advances made having been for General Sparrow’s individual uses and that of the minors, and that they are not chargeable therewith. They point to General Sparrow’s certificate approving those accounts as confirmation of their complaint.
Endorsed upon a paper which is annexed to their accounts and the accompanying depositions is a certificate in which he approves those rendered prior to the 4th of August, 1882, and in which it is stated that “the charges made therein for supplies furnished and advances made to enable (him) to carry on and administer said plantations *510 are correct, and were used in that way, except that a small part thereof, not exceeding one-sixth (if that much), was expended for the necessary support of the heirs of Mrs. Sparrow, and (were) so expended by their request, and with their consent that the crops of the place should be used by me in the payment thereof.” (Italics ours.)
On that date the total amount of John Chaffe & Sons’ account approximated $21,000, and was only increased during the succeeding year by about $6000.
But there is no proof as to the application of the last named advances; and there is no question of opponents’ liability for their proportionate shares of two-thirds of the $21,000, under the very terms of the certificate which opponents invoiced, although it might have been questionable under those of their original agreements. And we regard them equally bound for the amounts advanced to and consumed by the two minors, who had, at the time, no tutor, and were living in the family domicil. The major heirs, by virtue of their written agreements, came under a similar obligation to John Chaffe & Sons, as General Sparrow did. Even a greater one, because a large portion of the supplies and advances thus made was expended and used for their support, schooling and maintenance, and that of their nieces, with their knowledge and acquiescence. Bound as they were to John Chaffe & Sons and co-operating as they were with their father, in the management of the plantations of their mother’s succession, they were bound to have been aware of the necessities of the minors; and must be held to have consented to and acquiesced in what General Sparrow permitted to be done, and can not be allowed to shield themselves from the full measure of their responsibility for his indebtedness on that account.
(c) Opponents specially disown any responsibility, for any obligation of General Sparrow, arising out of his commercial enterprise, in the way of a store on Midland plantation; and, at the same time, they resist the demands of D. G. Tutt & Oo. and of Orr & Lindsley, to be paid the amount of their respective claims from the proceeds thereof.
It appears from the record, that the store in question was situated on the Midland plantation, it being one of the plantations then belonging to Mrs. Sparrow’s succession, and from it advances of supplies were made to it, and to the two others, and the laborers and employes on each. This store was operated by the employés *511 of General Sparrow, and supplied by John Ohaffe & Sons, in great part. D. G. Tutt & Oo. and Orr arid Lindsley, also, furnished it, in part, and the claims presented are for advances made to'it.
This store formed an important ingredient in the administration of those plantations, and we think the District Judge correctly treated the proceeds thereof, as forming a part of the assets to be used in effecting a settlement of John Ohaffe & Sons’ account. In so doing, he could not, with justice or propriety, have disregarded the lemands of other opponents for a share thereof.
The judgment fixes the amount of the proceeds of Midland store at $1640.75, and deducts therefrom $643.27 as the amount due D. G. Tutt & Oo., and $454.96 as the amount due Orr and Lindsley, and allows the balance of $542.79 as credit on the account of John Ohaffe & Sons. The sums due D. G. Tutt & Oo. and Orr and Lindsley, are not to be paid over to them, but are to be, retained in the hands of the administrator for payment, in due course of law.
Under the circumstances, nothing else could have been done.
Y.
The next important question to determine is the amount of the net proceeds of the crop of 1883, which was produced on the succession plantations, partly under the administration of Edward Sparrow, and partly under that of Ohaffe.
While it is true that Christopher Ohaffe was a member of the firm of John Ohaffe & Sons at the same time he was administrator of the succession, yet the proceeds of that crop stood to his credit as administrator on the books of John Ohaffe & Sons and were not under their dominion or control. For the purpose of facilitating settlement, and speeding ¡the trial of the account, the heirs of John Ohaffe, who departed this life in October, 1888, and the successors in title of John Ohaffe & Sons, filed an intervention, to which the opponents excepted, on various grounds. We are of the opinion that the District Judge properly permitted it to be filed, as it tended to subserve the purposes enumerated, and was in furtherance of the reservations made in our previous decrees.
The net proceeds of the crop of 1883, are stated in the tableau under discussion to be $13,853.83, inclusive of the stock of merchandise in Midland store; and, deducting this amount from the $42,-000.04 represented to be due John Ohaffe & Sons, and there is re *512 maining a balance in their favor of $28,047.20. As before stated, the judgment appealed from increased the amount to $20,298.06— including the proceeds of merchandise in Midland store, already considered.
The decree does not furnish us any data on which this amount is ascertained, but a comparison made of the judgment with the items enumerated on the tableau shows that in order to reach this estimate the judge a quo must have, necessarily, rejected many of them. This seems to be conceded by counsel on both sides in their briefs. Taking these admissions into consideration we will discuss the rejected items seriatim.
(а) The “ pay rolls of J. A. Gary, $700.08.”
The proof shows that Gary was a manager on the Arlington and Hopewell plantations, belonging to the succession, during the year 1883, and, as such, was charged with the settlement of the accounts of laborers, and the payment of their wages. For this purpose Ohaffe, administrator, placed the necessary funds in the hands of an agent on the premises, who furnished the plantation manager, as needed, and he made payments to the laborers on pay rolls, and they were, in turn, surrendered to the agent as vouchers. Every week the manager prepared pay rolls, certified to their correctness, and from the agent received the requisite sum of money to make his settlements. These pay rolls were offered and filed in evidence with - out objection, and other confirmatory proof was made of the expenditure of the money by the administrator, and that same was furnished by John Ohaffe & Sons. The only objection urged in argument is, that the quantum of evidence is insufficient to charge opponents. The testimony offered was, manifestly, all that was attainable. Gai’y was non est inventus, and, after the lapse of six years it would have been an utter impossibility to have obtained the testimony of the laborers themselves. We think the proof of this item is ample, and that it was incox'reetly disallowed.
(б) Balance of salary of E. H. Davis, as overseer, in 1882, $1481.96.
It appears that Davis had been for several years, general manager of the succession plantations while under the management of General Sparrow, and, whexx Ohaffe was qualified, and took charge, he ascertained this balance to be due him on account of the previous year, and, not questioning its correctness, paid it from the proceeds of the 1883 crop. The general complaint made' by opponents of this item *513 is, not of the amount, but of the fact that, same having been an item of credit in favor of General Sparrow, in 1882, it could not be paid from the crop of 1883, as that alone is matter for our consideration.
We think the proof is abundant, of the amount, being due, and of its having been paid by Ohaffe, administrator. When he took charge of the succession, it was at General Sparrow’s special request. He was not, at that time, advised, nor for several years thereafter, that the control and administration of these plantations did not constitute a part of his administration of the succession, and that of his predecessor in office. He had the impression that his administration was but a continuation of that of General Sparrow, and, doubtless, supposed that any preferred claim on the crop, like that of an overseer’s wages, could be with propriety paid from the proceeds of the crop of 1882, or 1883,.in differently, as his services extended to both, though under different administrators of the same succession. Notwithstanding he was in error in this assumption, yet the management and superintendence of General Sparrow continued until the 5th of July 1883, or for one-half of the year, and he was the absolute owner of the whole crop of that year. There is no question of the fact, that, under their written agreements, the major heirs were absolutely bound for all the legitimate and proper expenses of the cultivation of that crop, which General Sparrow contracted, and for those of previous years. What justice is there, then, in the demand of opponents, that John Ohaffe & Sons, and Ohaffe as administrator, shall lose this sum, because it was not technically a debt of the crop of 1883, notwithstanding it is one for which General Sparrow and they were legally bound? None.
It is our opinion that this debt should have been allowed, and that the judge a quo erred in rejecting it.
(c) Amount of 1883, $2000.
Under our decree in 29th of Annuals, we held that the administrator, Ohaffe, was chargeable with the rental value of the plantations of the successionat $4000 per annum from the date of his appointment, and he accordingly charged himself with $2000 on his 1888 account, for one-half of the year 1883. Now his claim is that, having paid this sum for the account of General Sparrow, and the heirs jointly, he is entitled to reimbursement out of the crop, for the net balance of which they are to receive credit. This is so manifestly just and correct, that argument seems unnecessary to strengthen and support it. *514 Had the crop of that year been equally apportioned between General Sparrow and Christopher Chaffe, individually, his claim would have been unfounded. But this is not the ease. The whole crop goes to the credit of'General Sparrow’s account, and it must be charged with this part of the rent. This item was incorrectly disallowed, also.
(d) Commissions of administrator of 2 1-2 per cent, on proceeds of crop of 1883, amounting in gross to $38,092.07, and aggregating-$972.30.
While the administrator was put to large expense and trouble in the management of this property he was not administrator quoad hoc— only a negotiomm gestor. His firm was the recipient of the crops, and sold fhem on usual terms.
He was the administrator of the remainder of the succession prop - erty, and will be entitled to commissions as such, on final settlement.
Various other intermediate agents and assistants were in his employ and engaged in the cultivation of thé crop. These are cases which tend to reduce his claim. Yet, it is not right for his services to go wholly unrewarded, and we think that his supervision and care of the crop for one-half the year 1883 should entitle the administrator to some allowance, and we therefore fix the compensation at $300, and to that amount this demand is reduced.
(e) Vouchers Nos. 284 and 180 for the aggregate amount of $191.32 were withdrawn by the administrator, and appropriate allowance was made on the tableau and judgment.
(/) The judge a quo increased the debits of the administrator by charging him with $733.33 for cotton seed of the crop of 1883, used in the crop of 1884; and for corn, likewise employed, valued at $996 — the two items aggregating $1730.08.
An examination of the evidence on the subject leaves our minds in doubt. After the lapse of so many years it is quite impossible for witnesses to testify with accuracy as to details of plantation expenditures, and it is equally as much so for courts of justice to render accurate judgments on their evidence. Hence, an appellate tribunal must in such case, of necessity, rest its judgment on the opinion of the judge below, who knows the witnesses and heard them testify. Therefore we will not disturb his judgment in this particular.
This completes our review of the account and tableaux. There *515 are some other matters adverted to in the oppositions, which we have not considered germane to a provisional account, and have, for that reason, passed them by without notice; but we will fully reserve their rights on the trial of the administrator’s final account.
The judgment must be amended so as to conform to the views herein expressed.
It is therefore ordered and decreed that the judgment appealed from be amended in the following particulars, viz:
1. So as to charge to and deduct from the amount fixed by the judgment, as the net proceeds of the crop of 1883, the following, viz:
(а) The pay rolls of Gary, $700.08
(б) Balance of Davis’ salary, $1481.96.
(e) One-half 1883 rent, $2000.
(d) Commissions on 1883 crop, $300.
Aggregating $4482.04.
Resulting in a net crop balance, in the hands of Ohaffe, administrator, of $16,353.81’for the year 1883.
2. So as to fix the net balance of Edward Sparrow’s indebtedness to John Ohaffe & Sons, as of date July 4, 1883, at $38,266.52; subject to a credit of the amount fixed herein above as the net balance of 1883 crop, whereby a final balance in their favor, and against Edward Sparrow as administrator of the succession plantations — from December, 1879, to July 4, 1883 — is produced, of $21,912.71, on which legal interest is to be computed from the 4th day of July, 1883, to date of payment.
3. So as to fix the amount for which each one of the shares Or interests of the major heirs — Mrs. Kate Foster and Mrs. Fannie Ash-bridge — respectively, are bound, at the sum of $7304.23, with like interest as last and from same date — that sum being one-third of the net balance due by Gen. Edward Sparrow.
It is finally ordered and decreed that these sums shall be, by the administrator, reserved out of their respective shares in the succession, on final settlement, and by him paid to John Ohaffe & Sons. That, in all other respects, the judgment appealed from be affirmed and the costs of appeal be taxed against opponents and appellants.
Rehearing refused.